**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH SMITH,** | : | **Civil No. 4:14-CV-116** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Judge Brann)** |
| | : | |
| **SUSQUEHANNA UNIVERSITY, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.     Statement of Facts and of the Case

This is a civil right action brought by a former student at a private university, Susquehanna University, against two campus police officers and the Director of Public Safety at Susquehanna University, alleging that these university employees violated Smith's rights under the Fourth Amendment to the United States Constitution in January of 2012 when they conducted a search of his dorm room which revealed a cache of illegal controlled substances.  This case comes before us for consideration of a motion for summary judgment filed by the remaining defendants in this action.  (Doc. 46.)  That summary judgment motion reveals the following essentially undisputed, facts in this case:

1

In January of 2012, Joseph Smith was a student at Susquehanna University in Selinsgrove, Pennsylvania.  Smith resided in Room 117 in the Scholar's House dormitory, and was the sole resident of this dormitory room.  Susquehanna University, in turn, is a private institution of higher education.  As part of its educational function, Susquehanna University employs Public Safety Officers as security personnel on its campus; however, these Public Safety Officers are not law enforcement officers, do not carry weapons, and do not have law enforcement powers.

In 2012 Susquehanna University had a specific written policy, adopted and ratified by the University's Board of Trustees, addressing the entry of student rooms for the purpose of conduct health and safety inspections and investigating possible criminal violations.  The policy provided, in part, as follows:

I. Inspections and Maintenance Visits:  The university makes periodic inspections of, and maintenance visits to, all university residence hall rooms for reasons of health, safety and maintenance.  The university reserves the right to enter rooms at any time for the purpose of making these inspections and maintenance visits.

II. Searches and Seizure:  A room may be searched and items seized if there is reasonable cause to believe that a student(s) is using his or her room for a purpose in violation of federal, state, or local law or of university regulations.  The Dean of Students or a designee must authorize all room searches, except those conducted by law enforcement officers.  University officials shall give the student(s) involved the opportunity to be present during the search unless the student(s) is unavailable.  The student involved will be informed of the purpose of the search and whether any material is found to be in violation of

2

federal, state or local laws and/or university regulation, or both…

Smith received a copy of the University handbook setting forth this University dorm room search policy when he enrolled at the University in 2008.

On January 23, 2012, at some point in the afternoon or early evening, the Susquehanna University's Department of Public Safety received a call from a resident advisor at Scholar's House about what she claimed to be a suspicious odor coming from Room 117, Joseph Smith's dorm room.   A Public Safety Officer, Officer McGee, responded to this call and went to Room 117, where she knocked on the door, but received no response.  While no one answered at the dorm room, as Officer McGee stood outside Room 117 she smelled a heavy and distinct odor of marijuana emanating from Smith's room.

Having made these observations, at 6:08 p.m. on January 23, 2012, Officer McGee sent an email to University Public Safety Officer Curt Brown and University Public Safety Officer Scott Moyer informing them of her observations.  Brown and Moyer, in turn, met with University Public Safety Director Thomas Rambo, who was an official designated under the University written policy as an authorizing official for dorm room searches.   Following this meeting Rambo, Brown and Moyer concluded that there was reasonable cause to believe that Smith was using his room for a purpose which violated federal, state, or local law as well as university

regulations, in that there was reasonable grounds to believe that Smith possessed marijuana inside his dorm room, conduct which violated State and federal law, and University regulations.  Accordingly, Rambo authorized a search of Smith's dorm room.

That search took place at approximately 9:37 a.m. on January 24, 2012, when Public Safety Officers Moyer and Brown went to Smith's dorm room in the Scholar's House.  When the Officers knocked on the dorm room door, and Smith answered, Officer Moyer observed a marijuana cigarette in plain view in an ashtray.  The Public Safety Officers then pushed their way through the door Smith had opened and forcibly entered the room, informing Smith that they were going to search the dorm room.  Officers Moyer and Brown proceeded to thoroughly search Smith's dorm room and belongings, over Smith's objections.  In the course of this search Moyer and Brown seized a number of items from Smith's room including suspected  marijuana, psychedelic mushrooms, powder cocaine, rock cocaine, marijuana pipes, a scale, a grinder, rolling papers and a DPS shirt and sign.  Subsequent laboratory testing conducted by state officials confirmed that a quantity of marijuana was among the items seized from Smith's dorm room.

Following this search, the suspected contraband was the turned over to the Selinsgrove Police Department by university officials, and criminal charges were

filed against Smith in the Court of Common Pleas of Snyder County.  While this seized evidence was turned over to the local police, the Selinsgrove Police never went to plaintiff's dormitory room, and did not participate in this search.

Smith, in turn, received an email from Thomas Rambo, telling him to report to Rambo's office on January 25, 2012.  Smith did not comply with this request, choosing instead to leave the school, and flee the state, on January 24, 2012.  Smith was then notified by the University on January 25, 2012, that he was alleged to have committed violations of the University's handbook by possessing this contraband, and that a hearing on the charges had been scheduled.  This notice also advised Smith that he was suspended from the University, and not permitted to be on University grounds "until your University Board hearing is held."  Acting on the advice of counsel, Smith chose not to attend his University Board hearing.  That hearing was then conducted *in absentia* and at the conclusion of this hearing Smith was expelled from the University.

In the meanwhile, state authorities pursued the criminal drug possession case which they had filed against Smith.  In the course of that state prosecution, Smith sought to suppress the evidence seized from his dorm room by Public Safety Officers on January 24, 2012.  That motion to suppress was denied by the state trial judge  on July 7, 2014.  In its ruling denying this motion to suppress the trial court held that:

"The suppression issue rises or falls on whether what took place on January 24, 2012, constitutes state action.  Based on the testimony presented the Court does not find that state action was involved in the search of Mr. Smith's room, Room 117.  The Court further finds that the search was conducted in accord with the Susquehanna University policy which was admitted into evidence, . . . .  The Court finds that the search conducted by DPS officers was based on reasonable belief that there were – the room was being used in violation of the law."  Following the denial of his suppression motion, on September 22, 2014, Smith pleaded *nolo contendere* to possession of a controlled substance in the Court of Common Pleas of Snyder County.

It is against this factual backdrop that the remaining defendants in this case have moved for summary judgment on Smith's Fourth Amendment claims. (Doc. 46.) The parties have fully briefed their respective positions on these issues, and this motion is now ripe for resolution.  For the reasons set forth below, it is recommended that the motion for summary judgment be granted, and the case dismissed.

## II.   Discussion

### A.   Rule 56–The Legal Standard

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant

6

summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56 (a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."

Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment."  Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995).  Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials."  Thimons v. PNC Bank, NA, 254 F. App'x

896, 899 (3d Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982).  "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).  In particular, a plaintiff cannot avoid summary judgment by simply relying upon a self-declaration that he has authored which relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (the nonmoving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with the conclusory allegations of an affidavit."); Iseley v. Beard, No. 02-2006, 2009 U.S. Dist. LEXIS 52014, *32 (M.D. Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence cannot be accepted as true).  Yet, while "only evidence which is admissible at trial

9

may be considered in ruling on a motion for summary judgment," <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995), and "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions," <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985), the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

### B.   The Defendants Are Entitled to Summary Judgement in this Case on State Action Grounds

At the outset, the defendants seek summary judgment in this case, arguing that the undisputed facts fail to show any action by them taken under color of state law, a prerequisite to a federal civil rights lawsuit under 42 U.S.C. §1983. We agree that Smith has not shown that the involvement of state authorities in these law enforcement matters was so pervasive that the University Public Safety officers were, in effect, state actors. On this score, Section 1983 provides in relevant part that:

> Every person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. §1983.

10

It is well-established that § 1983 does not by its own force create new and independent legal rights to damages in civil rights actions.  Rather, § 1983 simply serves as a vehicle for private parties to bring civil actions to vindicate violations of separate, and pre-existing, legal rights otherwise guaranteed under the Constitution and laws of the United States.  Albright v. Oliver, 510 U.S. 266, 271 (1994); Graham v. Connor, 490 U.S. 386, 393-94 (1989).  Therefore, any analysis of the legal sufficiency of a cause of action under § 1983 must begin with an assessment of the validity of the underlying constitutional and statutory claims advanced by the plaintiff.

In this regard, it is also well-settled that:

> Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law.  The two essential elements of a § 1983 action are:  *(1) whether the conduct complained of was committed by a person acting under color of state law*; and (2) whether this conduct deprived a person of a federally protected right.  Parratt v. Taylor, 451 U.S. 527, 535 (1981).

Boykin v. Bloomsburg University of Pennsylvania, 893 F.Supp. 409, 416 (M.D.Pa. 1995), aff'd, 91 F3d 122 (3d Cir. 1996)(emphasis added).  It is essential to any civil rights claim brought under § 1983 that the plaintiff allege and prove that the defendant was acting under color of law when that defendant allegedly violated the plaintiff's rights.  " 'Under color of law' and 'state action' are interpreted identically

under the Fourteenth Amendment.  Id. at 339; see also Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.1995).  Thus, a plaintiff seeking to hold an individual liable under § 1983 must establish that []he was deprived of a federal constitutional or statutory right by a state actor.  See Benn v. Universal Health Sys., 371 F.3d 165, 169–70 (3d Cir.2004).”  Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009).  Further, to the extent that a complaint seeks to hold private parties liable for alleged civil rights violations, it fails to state a valid cause of action under 42 U.S.C. § 1983 since the statute typically requires a showing that the defendants are state actors.  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

In making this state action determination:

Although there is no "simple line" between state and private actors, Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), . . . "[t]he principal question at stake is whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  Leshko, 423 F.3d at 339 (internal quotation marks and citation omitted).  To answer that question, [there are] outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists:  (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."  Mark, 51 F.3d at 1142 (other alterations, internal quotation marks and citations omitted).  Under any test, "[t]he inquiry is fact-specific."  Groman v. Twp. of Manalapan, 47 F.3d 628,

638 (3d Cir.1995); see also Crissman v. Dover Downs Entm't Inc., 289 F.3d 231, 234 (3d Cir.2002) (en banc) (noting that "the facts are crucial").

Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009).

Adopting this fact-specific and factually intensive inquiry, it is generally acknowledged that private security guards are not considered state actors for purposes of liability under §1983. Instead, such liability will only be imposed in special circumstances. For example, "Courts have held that private university public safety officers may act under color of state law when exercising police powers such as making arrests. See Henderson v. Fisher, 631 F.2d 1115, 1118 (3d Cir.1980) (finding campus police at the University of Pittsburgh acted under color of state law because the University was part of the state's public system and campus police had arrested plaintiff); Dempsey v. Bucknell Univ., 2012 WL 1569826 at *5–6 (M.D.Pa. May 3, 2012) (campus police at a private institution acted under color of state law when they arrested the plaintiff)." Mast v. Lafayette Coll., No. CIV.A. 13 4161, 2015 WL 409774, at *3 (E.D. Pa. Jan. 30, 2015). In the absence of such proof that college security personnel are exercising traditional and exclusive state law enforcement powers, no state action is present. Mast v. Lafayette Coll., supra. Similarly, "federal courts have found state action where a security guard is employed by a police department, Traver v. Meshriy, 627 F.2d 934 (9th Cir.1980), or works jointly with a

township police officer, <u>Padover v. Gimbel Bros., Inc.</u>, 412 F.Supp. 920 (E.D.Pa.1976) (Ditter, J.).  On the other hand, a security guard was held not to be a state actor where no state or municipal police power was involved, <u>see</u> <u>Wade v. Byles</u>, 83 F.3d 902 (7th Cir.1996), or when a college security guard, despite also being a local police officer, acts solely in his college-guard capacity, <u>see</u> <u>Robinson v. Davis</u>, 447 F.2d 753 (4th Cir.1971)." <u>Fleck v. Trustees of Univ. of Pennsylvania</u>, 995 F. Supp. 2d 390, 401-02 (E.D. Pa. 2014).  In still other instances, the question of whether campus police may be considered state actors has turned upon the degree to which state law confers law enforcement powers to this private security officials. <u>Boyle v. Torres</u>, 756 F.Supp.2d 983, 995 (N.D.Ill.2010) (campus police officers employed by private education institution were state actors under § 1983 because the campus police role is "one that has traditionally been the exclusive prerogative of the state"); <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 350 (N.D.N.Y. 2014), <u>reconsideration denied</u>, No. 5:14-CV-322 GTS/ATB, 2015 WL 1040172 (N.D.N.Y. Mar. 10, 2015); <u>Klunder v. Trustees & Fellows of the Coll. or Univ. in the English Colony of Rhode Island & Providence Plantations, in New England, in Am.</u>, No. CA 10 410 ML, 2011 WL 2790178, at *5 (D.R.I. July 13, 2011).  The question of whether private police or security officers are state actors is often a fact-bound inquiry but that question can be resolved at summary judgment if the undisputed

14

evidence fails to demonstrate special circumstances creating such a close nexus between the state and the conduct of a private college that seemingly private behavior may be fairly treated as the action of the state itself. See Traylor v. Hammond, 94 F. Supp. 3d 203, 214 (D. Conn. 2015).

Judged against these legal benchmarks, Smith's Fourth Amendment claim fails on state action grounds, since Smith has not shown that the University Public Safety officers were cloaked in state authority when they conducted this search. Indeed, when one examines the three-part test adopted by the courts for determining whether private conduct constitutes state action–: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity[1]–Smith's claim of state action fails on all three grounds.

At the outset, we note that it seems undisputed that the Susquehanna University Department of Public Safety Officers are not cloaked in the mantle of any official law enforcement powers. Thus, these Public Safety Officers are not sworn law enforcement officers, do not carry weapons, and do not exercise arrest or other law

---

[1]Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009)(citations omitted)

enforcement powers that typically are the province of the state.[2]  In the absence of

evidence showing that they exercised these powers, college public safety officers are

typically deemed private security officials, and cannot be viewed as state actors.  Nor

can it be said that these public safety officers were acting in concert with the state

when they engaged in the search of Smith's dorm room to such a degree that this

private conduct became state action.  Indeed, there simply is no evidence of concerted

action in this case, which typically would require state and private actors to be acting

together.   Instead, the evidence merely shows that campus security uncovered

contraband which they later turned over to the police.  Turning evidence of a crime

over to the police after-the-fact is a commonplace duty of private citizens and does

not make a private person a state actor.

In short, given the complete absence of any evidence showing that these Public

Safety Officers were granted law enforcement powers that are typically the exclusive

province of the state, or any proof suggesting that state authorities had so far

insinuated itself into a position of interdependence with the University Department

of Public Safety on January 24, 2012, that it must be recognized as a joint participant

---

[2]While one of the public safety officers may also have been an off-duty
police officer, this fact alone does not convert the activity at issue here into state
action for purposes of Section 1983.  See Robinson v. Davis, 447 F.2d 753 (4th
Cir.1971)

in the challenged search, Smith simply has not carried his burden of proving state action in this case, and his Fourth Amendment claims should be dismissed on summary judgment.

## C. This Search Was Conducted in Accordance With the University's Policy Which Was Disclosed to Smith in the University Student Handbook and Did Not Violate the Fourth Amendment

Entirely aside from the fact that Smith has not shown state action in this case, his search and seizure claim fails for another, independent reason.  It is generally well-settled that colleges and universities may have dormitory search policies.  Those policies, when disclosed to incoming students, are contractual in nature of govern the circumstances under which university officials may enter dorm rooms.  Therefore, when a school acts pursuant to its announced and disclosed policy in its student handbook, the student who has agreed to the school's policies by enrolling with notice of those policies is deemed to have consented to that search.  Medlock v. Trustees of Indiana University, 738 F.3d 867 (7 Cir.2013); Wagner v. Holtzapple, 101 F. Supp. 3d 462, 474 (M.D. Pa. 2015).

That is precisely what occurred here.  In 2012 Susquehanna University had a specific written policy, adopted and ratified by the University's Board of Trustees, addressing the entry of student rooms for the purpose of investigating possible

criminal violations. The policy provided, in part, that a room may be searched and items seized if there is reasonable cause to believe that a student is using the room for a purpose which violates federal, state, or local law or of university regulations. In this case on January 24, 2012, University officials had reasonable cause to believe that Smith was using his room to possess marijuana, conduct that violated state and federal law, as well as university regulation. This reasonable cause came from an olfactory source: a public safety officer smelled the distinctive odor of marijuana emanating from Smith's dorm room. As a legal matter: "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause. See United States v. Humphries, 372 F.3d 653, 658 (4th Cir.2004) ('[T]he odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.'); United States v. Winters, 221 F.3d 1039, 1042 (8th Cir.2000)." United States v. Ramos, 443 F.3d 304, 308 (3d Cir. 2006). Therefore, public safety staff had ample legal predication and grounds to conduct this search under the existing university policy, a policy which had been disclosed to Smith when he enrolled at Susquehanna University in 2008.

Smith nonetheless attempts to avoid the legal impact of this university policy upon his case by arguing that the university failed to follow its policy, a exception to this school consent search rule which we have previously recognized. See Wagner

v. Holtzapple, 101 F. Supp. 3d 462, 474 (M.D. Pa. 2015).  Smith's arguments on this

score are unpersuasive, however.  Seizing upon the language in the University's

policy handbook which stated that University officials shall give the student involved

in a dorm search the opportunity to be present during the search unless the student is

unavailable, Smith tries to suggest that the policy created a requirement of advance

notice to the student prior to conducting a search, a requirement that Smith contends

was not satisfied here.  Smith then insists that the search was, therefore, improper and

unlawful under the school's own policy.

In our view this argument fails for at least three reasons.

First, this claim fails linguistically, since it equate presence with advance

notice, two very different concepts.  Smith enrolled at Susquehanna University due

to that school's stellar academic reputation.  Given that well-earned reputation, we

have no doubt that school officials understood the difference between a policy which

allowed students to be present during dorm search, when practicable, and a policy

which required advance notice of a search to a student.  The school's written policy

only offered students the opportunity to be present at any search, if practicable.  The

plain language of that policy, therefore, cannot be tortured into the construction urged

by Smith:  a policy which provides a student with an absolute right to advance notice

of a school dorm room search.

In addition to being contradicted by the plain language of the University policy, Smith's strained interpretation of this policy defies common sense.   Smith's construction of this policy ignores the evil that policy is designed to address, suspected criminal conduct on campus.   By its terms, this search policy applies whenever university officials have reasonable grounds to believe that evidence of a crime in concealed in a dorm room.   Once university officials have reasonable grounds to believe that criminal conduct is on-going, it is risible to assert that the University must provide the suspected wrongdoer advance notice of its suspicions. In this setting, it defies reason to believe that the University would impose upon itself a policy that requires it to make an advance appointment with the student suspected of criminal conduct in order to search that student's dorm room.

Finally, this argument fails on the facts since it is abundantly clear that Smith was present in the dorm room when this search began.  Thus, Smith was afforded all that was provided for under the school's policy, an opportunity to be present during the search.  Given this immutable fact, Smith cannot now be heard to complain that this search did not comport with the student handbook policies, policies which only permitted Smith to be present during any search.

In sum, finding that the search conducted here fully comported with the University's policy handbook, that Smith had notice of this policy when he enrolled

at Susquehanna University and, therefore, consented to the university policy upon enrollment, we conclude that the search was entirely lawful and proper, and may not form the basis for a Fourth Amendment claim.

### D.    The Defendants Are Entitled to Qualified Immunity

Finally, we conclude that the defendants are entitled to qualified immunity from damages in this case. In order to establish a civil rights claim Smith must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Smith is entitled to recover damages from these officials. Officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a

21

mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The

Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id.  Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity.  Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant

(viewed in a light most favorable to the plaintiff).")  Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment.  See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In the specific factual context of private university public safety officers' conduct, courts have frequently held that the actions of these officials do not rise to the level of state action when, as in this case, the officials are not cloaked in law enforcement authority and are not working closely with state officials.  See e.g., Traylor v. Hammond, 94 F. Supp. 3d 203, 214 (D. Conn. 2015); Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 350 (N.D.N.Y. 2014), reconsideration denied, No. 5:14-CV-322 GTS/ATB, 2015 WL 1040172 (N.D.N.Y. Mar. 10, 2015).  Moreover, courts have held that searches conducted pursuant to an announced and disclosed policy in the school's student handbook do not offend the Fourth Amendment.  Medlock v. Trustees of Indiana University, 738 F.3d 867 (7 Cir.2013); Wagner v. Holtzapple, 101 F. Supp. 3d 462, 474 (M.D. Pa. 2015).  Applying these benchmarks to the school search conducted here, we find that the defendants are entitled to qualified immunity in this case.  Nothing in the conduct undertaken by the defendants here could have alerted these officials that their actions violated "clearly established statutory or

constitutional right[] of which a reasonable person would have known." <u>Wilson v.</u>
<u>Layne</u>, 526 U.S. 603, 609 (1999).  Therefore, these officials should be entitled to
qualified immunity from damages in this case.

Indeed, to hold otherwise would yield a bizarre and inequitable result since the
state courts have already determined that this search was lawful in Smith's criminal
case.  Therefore, in order to deny the defendants summary judgment on qualified
immunity grounds, we would have to conclude that a search which was found lawful
in state court nonetheless violated clearly established constitutional norms.

This we cannot do.  As we have noted,  in his state criminal case Smith sought
to suppress the evidence seized from his dorm room by reprising the same Fourth
Amendment arguments that he advances in this lawsuit.  Those arguments were
rebuffed, however, by the state court trial judge  on July 7, 2014.  In its ruling
denying this motion to suppress the trial court held that: "The suppression issue rises
or falls on whether what took place on January 24, 2012, constitutes state action.
Based on the testimony presented the Court does not find that state action was
involved in the search of Mr. Smith's room, Room 117.  The Court further finds that
the search was conducted in accord with the Susquehanna University policy which
was admitted into evidence, . . . . The Court finds that the search conducted by DPS
officers was based on reasonable belief that there were – the room was being used in

violation of the law." Following the denial of his suppression motion, on September 22, 2014, Smith pleaded *nolo contendere* to possession of a controlled substance in the Court of Common Pleas of Snyder County.

This state court ruling underscores that Smith's Fourth Amendment rights were neither clearly established, nor violated by the defendants on January 24, 2012. Therefore, while we decline any invitation to hold that the fact of this state court conviction, standing alone, precludes a civil rights claim by Smith as a matter of law, it is evident that none of the rights claimed by Smith are clearly established in this factual context. Accordingly, defendants enjoy qualified immunity, and Smith's complaint should be dismissed.[3]

## III.   **Recommendation**

For the foregoing reasons, IT IS RECOMMENDED that the defendants' motion for summary judgment (Doc. 46.) be GRANTED, and this case dismissed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen

---

[3]While the defendants have not separately argued qualified immunity in this motion, this court is entitled to address this defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge).

(14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 1st day of June 2016.


**_S/Martin C.  Carlson_**
Martin C. Carlson
United States Magistrate Judge